# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs June 2, 2016

## IN RE KENDRA P. ET AL.

### Appeal from the Juvenile Court for Sevier County
### Nos. 15-000940, 15-000941, 15-000942, 15-000943
### Dwight E. Stokes, Judge

### No. E2015-02429-COA-R3-PT-FILED-JULY 28, 2016

Mother appeals the termination of her parental rights to her seventeen-year-old daughter. We have concluded that the Department failed to prove by clear and convincing evidence that it is in the child's best interest to terminate her mother's parental rights in part because the child is seventeen years old, is not a candidate for adoption, and intends to maintain a relationship with Mother when she turns eighteen. Therefore, we reverse the termination of Mother's parental rights to her seventeen-year-old daughter.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which THOMAS R. FRIERSON, II, and KENNY W. ARMSTRONG, JJ., joined.

Dean Curtis Griffey, Morristown, Tennessee, for the appellant, Debbie S.[1]

Herbert H. Slatery, III, Attorney General and Reporter; and Peako A. Jenkins, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

## OPINION

The Tennessee Department of Children's Services ("the Department") filed a petition on July 17, 2015, to terminate the parental rights of Debbie S. ("Mother") to her four children. Following a trial, the juvenile court terminated Mother's parental rights to all four children. In this appeal, Mother only challenges the termination of her parental

---

[1] This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

rights to Kendra P., the oldest of her four children, who was born in May 1999 and will reach the age of majority in approximately ten months from the filing of this opinion.[2]

The relevant events leading up to the filing of the petition to terminate the parents' parental rights include the following. The Department removed the children on July 10, 2014, and they have been in foster care continuously ever since. Mother was in jail from June 10, 2014, until August 18, 2014. Thus, she was in jail when the children were removed. On July 14, 2014, the Sevier County Juvenile Court issued an emergency protective custody order placing the children in temporary state custody. In the same order the court further found that the Department made reasonable efforts to prevent removal by providing Family Support Services in the months leading up to the removal. On September 10, 2014, the juvenile court adjudicated the children dependent and neglected.

Mother signed the permanency plan on September 2, 2014. The juvenile court ratified the initial permanency plan on September 10, 2014 as being in the children's best interests and found that the requirements were reasonably related to remedying the reasons for foster care. The plan was amended to include the requirement to complete an alcohol and drug assessment and follow all recommendations. Mother attended this hearing and had the benefit of appointed counsel throughout the process.

The permanency plan was revised on January 6, 2015. It restated the requirements of the first plan except that a goal of "Adoption" was added. The revised plan also restated the need for Mother to find stable housing and to actively participate in the required alcohol, drug, and mental health treatment as recommended. Mother signed the revised plan on March 11, 2015.

On April 1, 2015, the juvenile court ratified the revised permanency plan as in the children's best interests and found that the revised requirements were reasonably related to remedying the conditions requiring foster care. The order noted that Mother had completed various assessments but had not otherwise made progress on the permanency plan. The order also noted that she needed to show "considerable progress" in the future.

While all four children were placed in the same foster home initially, Kendra was later separated from her younger siblings due in part to behavioral issues and her age. In addition, Kendra had previously functioned as a parent for her three younger siblings, who still "relied on Kendra so much to parent them," which conflicted with the role of

---

[2] The parental rights of Glenn P., the father of Kendra P., were also terminated, and he has not appealed. Accordingly, the trial courts findings that solely pertain to Father have been omitted because he did not appeal the termination of his parental rights.

the foster parents.[3] By the time of trial, the three younger siblings, Glenn Jr., who was 6, Aliyah, who was 8, and Malachi, who was 10, were residing in the same pre-adoptive foster home where they were thriving. As for Kendra, who was 16 years old at the time of trial, she was residing in a separate foster home that, significantly, was not a pre-adoptive home.

In the petition to terminate, the Department alleged, *inter alia*, that Mother had not substantially complied with the requirements set out in the permanency plans. The petition further alleged that Mother abandoned the children due to multiple incarcerations for various criminal offenses including driving under the influence, the sale of counterfeit controlled substances, the delivery of Schedule III controlled substances, and shoplifting, which exhibited a wanton disregard for the children's welfare. It was further alleged that termination was in the children's best interests because Mother abuses drugs and alcohol, which consistently renders her unable to care for the children in a safe and stable manner.

The case was tried on November 13, 2015, and the court heard testimony from Mother; Sarah Guy, a former Resource Coordinator with Omni Visions; and Jan Gardner, a Family Service Worker with the Department who served as the Case Manager on this case continuously since September 2014.[4] The Department also submitted several certified copies of convictions, case recordings, and a printout showing the services the Department provided. The final order that followed states "[t]his family's life has been unstable and erratic for a long time. The parents' behaviors have created significant risks for neglect and actual neglect over these children."

The court found that two grounds for termination were applicable to Mother: pre-incarceration conduct exhibiting wanton disregard for the welfare of the children ("wanton disregard") and substantial non-compliance with the parenting plan. *See* Tenn. Code Ann. §§ 36-1-102(1)(A)(iv), -113(g)(1) & (2). Regarding wanton disregard, the court found that at the time of the filing of the petition Mother was incarcerated, that she was served with the summons at the jail, and she was not released until October 5, 2015.

---

[3] The conflict was explained by Case Manager Jan Gardner as follows:

> [Kendra's] a precious, precious child. She has been a parent to her younger siblings. That is why she doesn't live with her younger siblings because it's very difficult for Kendra -- for the younger siblings to rely on an adult parent because they've relied on Kendra so much to parent them. And she's assumed that responsibility up until coming into foster care. At that time, she could see the conflict that was causing. And she actually asked to be moved into a different foster home away from her younger siblings because . . . she does want their well-being.

[4] According to Jan Gardner, Omni Visions is a company with which the Department contracted for services.

The court also found that Mother was incarcerated twice while the children were in the Department's custody. The court went on to state that it considered Mother's pre-incarceration behavior, which included multiple episodes of theft, narcotic abuse, and violations of probation. Based upon the foregoing, the juvenile court concluded that the Department had proven the ground of wanton disregard pursuant to Tennessee Code Annotated §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv) by clear and convincing evidence.

The juvenile court also found that the Department had proven a second ground that was applicable to Mother: substantial non-compliance with a permanency plan. *See* Tenn. Code Ann. § 36-1-113(g)(2). In pertinent part, the juvenile court found that Mother participated in the development of the permanency plans, which called upon her to complete some very basic requirements, namely to obtain and maintain suitable housing, to seek employment, and provide a safe, drug-free environment for the children. The plans also called upon Mother to complete an alcohol and drug assessment, to complete mental health assessments, and to follow all recommendations.

The court found that Mother completed drug treatment while in jail and participated in the recommendations that resulted from her mental health assessment. However, although Mother was out of jail, she had not obtained suitable housing or employment. The court found that she resided in a one-room apartment with a friend, was not employed, and had no means of income. Further, the court found that Mother relied on the goodwill of friends to survive and did not have the resources to buy food or clothes for herself or her children.

Based upon the foregoing findings, the juvenile court concluded that the Department had proven the ground of substantial non-compliance with the permanency plan under Tennessee Code Annotated §§ 36-1-113(g)(2) and 37-2-403(a)(2).

Having found two grounds for terminating Mother's parental rights, the juvenile court conducted a best interest analysis. The entirety of the juvenile court's best interest findings read as follows:

> The Court finds that the facts and circumstances in this case warrant a finding of best interest by clear and convincing evidence. This Court carefully considered the factors as enumerated in Tenn. Code [Ann. §] 36-1-113(i) and finds that several of them are apparent by clear and convincing evidence. The Court notes the first factor in particular as weighing strongly in favor of finding that the State has met its burden of proof, namely:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian.

Pursuant to [Tenn. Code Ann. §] 36-1-113(i) and the associated case law such as *White v. Moody*, 171 S.W. 3d 919 (Tenn. Ct. App. 2004) and *In Re Giorgianna H.*, 205 S.W. 3d 508 (Tenn. Ct. App. 2006), once a parent has been found to be unfit, the interests of the parent and the child diverge. The focus of the proceedings shifts to the best interest of the child. Three of these children, Aliyah, Glenn Jr. and Malachi, are in a foster home which is a loving, stable home where the children appear to be thriving and the court is concerned with continuity of placement. This is a preadoptive placement. The children are in therapy and their educational and behavioral needs are being met in that home. As we stand today, father has not visited nor supported. Mother has never supported the children and she admits that she does not have suitable housing for the children.

On closing, [M]other's counsel argued against termination of [Kendra P.] based upon Kendra's unique circumstances, her bond with the mother and her current, stated wishes not to be adopted. The evidence reflects that this child has recently been open to adoption though. It is clear from the record that this child has been made to "parent" the other children; that [Mother] put Kendra in that role and that Kendra would have a greater opportunity to find a forever home if she was in the full guardianship of the Department of Children's Services. The Department's counsel expressed optimism that the Department could find a suitable pre-adoptive home and that Kendra might change her mind (again) about adoption. Guardian Ad Litem took that view also which this Court shares. Kendra deserves the opportunity to move on with her life. This termination of parental rights as to both parents allows her to do that. **By clear and convincing evidence, and pursuant to Tenn. Code [Ann.] § 36-1-113(i), the Court finds that it is in the best interest of the children to terminate the parental rights of [Mother] and [Father]**.

(Emphasis in original).

Based upon its findings and conclusions of law, the juvenile court terminated Mother's parental rights to all four children. The final judgment was entered on November 18, 2015. Mother filed a timely notice of appeal; however, as noted earlier, she only appeals the termination of her parental rights to Kendra, the oldest of her children. Mother does not appeal the termination of her parental rights to her three younger children.

## ISSUES

Mother's only issue on appeal is that the evidence fails to clearly and convincingly demonstrate that it is in Kendra's best interest for Mother's parental rights to be terminated. Although Mother does not challenge the grounds for terminating her parental rights, we shall also examine the grounds for terminating Mother's parental rights. *See In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[I]n an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.")

## STANDARD OF REVIEW

"To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re F.R.R., III*, 193 S.W.3d 528, 530-31 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). We review findings of fact made by the trial court de novo upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." *In re F.R.R., III*, 193 S.W.3d at 530-31 (quoting Tenn. R. App. P. 13(d)).

"In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524; *see In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010). The trial court's ruling regarding whether the evidence sufficiently supported termination is a conclusion of law, which we review de novo with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524.

## ANALYSIS

Proceedings to terminate parental rights are involuntary in nature; therefore, they implicate federal and state constitutional concerns. *In re Angela E.*, 303 S.W.3d 240, 249 (Tenn. 2010). The Tennessee Constitution gives parents a right of privacy to care for their children without unwarranted state intervention unless there is a substantial danger of harm to the child. *In re Swanson*, 2 S.W.3d 180, 187 (Tenn. 1999) (citing *Hawk v. Hawk*, 855 S.W.2d 573, 579 (Tenn. 1993)). Although fundamental, this right is not absolute, and a parent may forfeit this right by abandoning or otherwise engaging in conduct that substantially harms the child. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007).

Termination proceedings in Tennessee are governed by statute, and our Supreme Court has discussed the statutory component of such proceedings as follows:

Pursuant to section 36-1-113(c):

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

The party petitioning for termination carries the burden of making both of these showings. *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004); *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004). . . .

Our statute sets forth the available grounds for termination of parental rights. *See* Tenn. Code Ann. § 36-1-113(g); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). The petitioner need only establish the existence of one of those statutory grounds to support a termination. *Valentine*, 79 S.W.3d at 546. If the petitioner establishes grounds for termination, only then does the court determine whether termination is in the best interests of the child. *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004). **The statute enumerates factors for the best interests analysis that the court "shall consider," but, as opposed to the inquiry into grounds for termination, the best interests analysis "is not limited to" the factors enumerated in the statute**. Tenn. Code Ann. § 36-1-113(i); *see In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005).

*In re Angela E.*, 303 S.W.3d at 250-51 (emphasis added; footnotes omitted).

The termination of parental rights must be based upon a finding by the court "by clear and convincing evidence" that the grounds for termination have been established and that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c). Thus, clear and convincing evidence is required for both steps of this process. *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 250. "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (internal citations omitted); *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992);

- 7 -

*O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995). Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *O'Daniel*, 905 S.W.2d at 188. In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn. 1977); *Goldsmith v. Roberts*, 622 S.W.2d 438, 441 (Tenn. Ct. App. 1981); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992).

## I. WANTON DISREGARD

The applicable definition of abandonment for purposes of this action to terminate parental rights reads:

> [a] parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, *or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child*; . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (emphasis added).

Petitioners can establish this ground for termination by demonstrating that the parent was incarcerated at the time of the institution of the proceeding and that the parent's conduct prior to that period of incarceration demonstrated a wanton disregard for the welfare of the child or children. *See id.*; *In re Audrey S.*, 182 S.W.3d 838, 870-71 (Tenn. Ct. App. 2005). In assessing the parent's conduct, this court is not limited to the four-month period before the institution of the relevant proceeding and may consider conduct that occurred at any point before the parent was incarcerated. *See In re Audrey S.*, 182 S.W.3d at 871. As for the type of conduct that demonstrates wanton disregard, this court has "repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68.

The juvenile court made the following findings regarding the ground of abandonment based on willful and wanton conduct:

The Court finds that, at the time of the filing of the Department's petition, both parents were incarcerated. Jan Gardner testified, and the proof is unrebutted, that [the Department] provided services to the parents in the late Spring, 2015 while they were both in the jail. Father was not released until approximately May 21, 2015 while mother was served with the summons at the jail. Mother was not released until October 5, 2015. Mother was incarcerated twice while the children were in custody. Their incarceration serves only as the triggering event; the Court has considered their pre-incarceration behavior which includes their multiple episodes of theft and narcotic abuse, and her violation(s) of probation.

The Department introduced exhibits Collective 12 and Collective 22 which consisted of certified copies of the parents' convictions. They include the following:

> a. On 11-9-2004, mother pled guilty to DUI 1st (offense date 8-9-2004);
> b. On 11-9-2004, mother pled guilty Reckless Endangerment (offense date was also 8-9-2004). She had a three-year old child in her vehichle [sic] on this date.
> c. On 8-19-2013, mother was convicted of Sale of Counterfeit Controlled substance (offense date 10-16-2012);
> d. On 8-19-2013, mother was convicted of Delivery of Schedule III controlled substance (offense date 10-16-2012);
> e. On 11-19-2013 mother pled guilty to Shoplifting (incident occurred on 8-3-2013);
> f. On 6-24-2014, mother pled guilty to contributing to the delinquency of a minor (offense date of 5-9-2014). Malachi and Aaliyah had accrued many unexcused absences.
> g. On 6-24-2014, mother pled guilty to violation of probation (violation date of 6-6-2014)
> h. On 3-6-2015; mother pled guilty to violation of probation (violation date of 10-21-2014);
>
> . . . .

Based on the foregoing findings, the juvenile court found the Department had proven by clear and convincing evidence the requirements of abandonment pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv).

As noted above, abandonment includes the parent having engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv). Further, "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 868. The evidence does not preponderate against the trial court's findings that Mother had been convicted of the above-listed offenses. Additionally, these offenses constitute the kind of conduct that exhibits wanton disregard for the welfare of a child. *See id.* Consequently, the Department has proven the above criteria by clear and convincing evidence, and we affirm the juvenile court's finding that the Department proved the ground of wanton disregard.

## II. SUBSTANTIAL NON-COMPLIANCE WITH A PERMANENCY PLAN

In order to prove the ground of substantial non-compliance with a permanency plan, the Department must make two showings. First, it must demonstrate that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parents' custody initially. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004); *see* Tenn. Code Ann. § 37-2-403(a)(2)(C). In order to satisfy this requirement, the trial court must make a finding that the plan's requirements are reasonable "in conjunction with the determination of substantial noncompliance under [Tenn. Code Ann.] § 36-1-113(g)(2)." *In re Valentine*, 79 S.W.3d at 547.

Second, the Department must demonstrate that the "noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656. "Substantial" means "[o]f real worth and importance." *In re Valentine*, 79 S.W.3d at 548 (quoting Black's Law Dictionary 1428 (6th ed. 1990)). Thus, "[t]rivial, minor, or technical deviations" from the requirements of a permanency plan do not amount to substantial noncompliance. *In re M.J.B.*, 140 S.W.3d at 656. Terminating parental rights based on substantial noncompliance "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *Id.*

The juvenile court made the following findings regarding the ground of substantial non-compliance:

> Both parents have failed to comply in a substantial manner with those reasonable responsibilities set out in the foster care plans related to remedying the conditions which necessitate foster care placement. The Department developed plans which were subsequently ratified by the Sevier County Juvenile Court. The parents, participated in the development

of the permanency plans which called for them to complete some very basic requirements, namely, to obtain and maintain suitable housing, to seek employment, and to be able to provide a safe drug free environment for their children. The plans also called for them to complete an alcohol and drug assessment and to follow all recommendations and to complete mental health assessments and follow all recommendations. [Father], other than completing the alcohol and drug assessment and the mental health assessment, has made very little progress or otherwise shown that he has done anything to rectify the initial reasons for removal.

By contrast, mother was able to complete more requirements. Mother did complete drug treatment while in jail and she also participated in the recommendations following her mental health assessment, namely, individual therapy. By the time of the hearing though mother had not obtained suitable housing. She resided in a room apartment with a friend; she was not employed or had any means of income although she stated that she had worked one hour at McDonalds Mother is not able to feed or clothe herself left alone her children. Mother admitted that she relies on the goodwill of friends. Her plan is to get better housing and to get a job but she did not have that at the time of trial. By clear and convincing evidence, the requirements of Tenn. Code [Ann.] §§ 36-1-113(g)(2) and 37-2-403(a)(2) have been met and this adverse finding is against both parents. . . .

The record demonstrates that the requirements of the permanency plan were reasonable and related to remedying the conditions that caused Kendra to be removed from her mother's custody. *See In re M.J.B.*, 140 S.W.3d at 656; *see also* Tenn. Code Ann. § 37-2-403(a)(2)(C). The record also demonstrates that Mother's noncompliance was substantial in light of the importance of the requirements Mother failed to satisfy. *In re M.J.B.*, 140 S.W.3d at 656. Stated another way, Mother's failures are more than "[t]rivial, minor, or technical deviations . . . ." *Id.* Therefore, we affirm the juvenile court's finding that the Department proved the ground of substantial noncompliance with the permanency plan.

### III. BEST INTERESTS OF THE CHILD

Mother contends the Department failed to prove by clear and convincing evidence that termination of her parental rights was in Kendra's best interest. Specifically, she contends it is not in Kendra's best interest because Kendra desires to maintain contact with her mother "at any cost" and Kendra's chances of being adopted are "slim."

As noted earlier, the Department bears the burden to prove, by clear and convincing evidence, at least one statutory ground for termination **and** that termination is

in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. Although it is a rare occurrence, termination of an unfit parent's parental rights is not always in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. "While a finding of parental unfitness is a necessary prerequisite to the termination of parental rights, a finding of unfitness does not necessarily require that the parent's rights be terminated." *Id.* (citing *White v. Moody*, 171 S.W.3d 187 (Tenn. Ct. App. 2004), *perm. app. denied* (Tenn. Mar. 21, 2005); *In re Termination of Parental Rights to Alexander V.*, 271 Wis.2d 1, 678 N.W.2d 856, 863 (2004)). Because not all parental misconduct is irredeemable, Tennessee recognizes the possibility that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.*

In the context of terminating parental rights, the term "best interest" is not defined by statute. *In re Dominique L.H.*, 393 S.W.3d 710, 717 (Tenn. Ct. App. 2012). An excellent review of the nuances of a best interest analysis is set forth in *In re Audrey S.*, 182 S.W.3d at 877-79. It reads in pertinent part:

> In recent years, the Tennessee General Assembly, like other state legislatures, has undertaken to codify the factors that courts should consider when called upon to ascertain a child's best interests in various circumstances. In termination of parental rights cases such as this one, the General Assembly has provided the courts with a non-exclusive list of nine factors to consider. Tenn. Code Ann. § 36-1-113(i). Thus, ascertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests. *White v. Moody*, 171 S.W.3d at 192.
>
> The child's best interests must be viewed from the child's, rather than the parent's, perspective. *White v. Moody*, 2004 WL 3044909, at *5; *In re Hammett*, No. 245221, 2003 WL 22416515, at *2 (Mich. Ct. App. Oct.23, 2003); *In re L.N., Jr.*, 690 N.W.2d 245, 247 (S.D. 2004); *In re Marriage of Pape*, 139 Wash.2d 694, 989 P.2d 1120, 1130 (1999). A focus on the perspective of the child is the common theme running through the list of mandatory factors specified in Tenn. Code Ann. § 36-1-113(i). By the time the court reaches the best interests analysis, it will have already made a finding, supported by clear and convincing evidence, that the parent is unfit or poses a risk of substantial harm to the welfare of the child. Accordingly, the exclusive focus on the perspective of the child in the best interest analysis does not contravene the parent's constitutional rights.
>
> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a

determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis. *White v. Moody*, 171 S.W.3d at 194.

*In re Audrey S.*, 182 S.W.3d at 877-78 (footnotes omitted).

Although she did not articulate it as such, Mother relies on the reasoning set forth immediately above whereby ascertaining a child's best interest is not as simple as calculating whether the sum of the statutory factors tip in favor of or against termination. *See White*, 171 S.W.3d at 194. As for a rote examination and summation of each factor, Mother admits that a majority of the statutory factors weigh in favor of termination. For example, she admits not having effected changes in her life that would allow her to obtain custody of Kendra, not finishing some steps of the permanency plan, including finding stable housing, income, and transportation, and not having paid child support. However, she insists she maintained visitation with Kendra when possible. Despite "some hiccups," as she refers to her arrests, Mother insists that termination of her parental rights is not in Kendra's best interest because of two primary considerations: the fact that Kendra is not a candidate for adoption and "the very meaningful, established relationship" between Kendra and Mother.

The record supports Mother's contention that Kendra is not a candidate for adoption. Kendra was born in May 1999. Thus, she is seventeen years old and will reach the age of majority less than ten months after this opinion is filed. Additionally, Kendra is not in a pre-adoptive home and therefore is not a candidate for adoption. Contrary to the "expressed optimism" of the Department's counsel who represented to the juvenile court "the Department could find a suitable pre-adoptive home"—an assertion that is not supported by any fact in the record—the evidence supports Mother's contention that Kendra is not going to be adopted by anyone. When asked at trial if the children were in a pre-adoptive home, Ms. Gardner, the Department's Case Manager, testified that "Malachi, Aaliyah, and Glenn, Jr., are all in a preadoptive home," but as for Kendra's situation:

Kendra has vacillated about adoption, not adoption. **We had a meeting just this past week and she would prefer not to be adopted unless she could potentially be adopted by the foster parents that are parenting the younger children. That's not something that's going to be possible at this juncture.**

(Emphasis added).

In response to the question, "With respect to Kendra, do you believe it's in the best interest of Kendra to terminate [Mother's] parental rights?" Ms. Gardner stated:

> I think Kendra will not be able to move forward in accepting a possible adoptive placement. She is still very conflicted and changes between wanting to be adopted, not wanting to be adopted. She wanted to be adopted, of course, by the three younger children's family . . . that they're with. But that's not going to be possible. **[S]he reported to me that she wanted to be really honest, and even if we terminated her mother's parental rights, she was going to maintain contact.**

(Emphasis added). Thus, the unique circumstances of this case make an adoption of Kendra most improbable.

Furthermore, the record supports Mother's contention that she and Kendra have "a very meaningful, established relationship." *See* Tenn. Code Ann. § 36-1-113(i)(4). When Mother was asked at trial to explain her relationship with Kendra, she stated: "Kendra, she's my best friend. I mean, I was very young when I had her. I was eighteen. So, we kind of grew up together. And she's my best friend." The close relationship between them is also supported by the testimony of Ms. Gardner. As Ms. Gardner explained at trial, Kendra told Ms. Gardner there was no way that she was going to lose contact with her mother. Furthermore, Kendra told Ms. Gardner she would do what it takes, "even if it means sneaking," to make sure that she can continue to have a relationship with her mother. When asked at trial if she believed Kendra "has the means and that she will follow through" with maintaining contact with Mother "regardless of what happens," Ms. Gardner stated "Absolutely." Thus, the evidence in this record clearly established that the very meaningful, established relationship between Mother and Kendra was a two-way street.

In furtherance of her position that termination of her parental rights in not in Kendra's best interest, Mother relies on our reasoning in *In re C.M.S.*, No. W2004-00295-COA-R3-PT, 2004 WL 2715331 (Tenn. Ct. App. Nov. 19, 2004). In that case the trial court found it was in the best interest of a child with limited mental and emotional capacities to terminate her mother's parental rights. *Id.* at *3. On appeal, we reversed the best-interests finding despite the fact that much of the evidence weighed against the mother. *Id.* at *6, 8. This evidence included "the fact that [the child's mother] has no prospects of employment in the near future, her past failure to provide a safe and suitable home for the minor child in the face of abuse, her lack of education, and the fact that [the mother] had no suitable residence for the child at the time of trial." *Id.* at *6.

Notwithstanding these facts, we determined that terminating the mother's parental rights was not in the child's best interest because it would disrupt the child's life without the benefit of allowing C.M.S. to be adopted. *See id.* at *6-8. C.M.S. had a meaningful

relationship with her mother and enjoyed visiting her. *Id.* at *7. Visitation with the mother was one part of "an emotional anchor" for the C.M.S., and removing that relationship could "severely disrupt" her life. *Id.*

Additionally, we found that maintaining the mother's parental rights would not be detrimental to C.M.S. because C.M.S. would remain in the custody of her foster family. *Id.* We noted that

> the concerns regarding the instability of [the mother's] living arrangement and her inability to properly care for C.M.S. are somewhat diminished under the present circumstances of supervised visitation. There is no evidence in the record that [the mother's] visits hinder C.M.S. or have a negative impact on C.M.S.' emotional status. Moreover, because C.M.S. resides in the exclusive physical custody of her foster parents, the physical or permanent condition of [the mother's] home, under these particular circumstances, is irrelevant.

*Id.* Finally, we noted that C.M.S. did not have any reasonable prospects for adoption. *Id.* We stated:

> While it is reasonable to assume that as a child ages, her chances of adoption generally diminish, we stress that C.M.S. is fourteen years old, and note that there is nothing in the record to indicate that she is a subject for adoption or currently has reasonable prospects for adoption. Based on C.M.S.' advanced age, and her learning, emotional and behavioral difficulties, this Court is not optimistic that the child is or would be a likely candidate for adoption. Therefore, under the exceptional circumstances of this case, to deprive C.M.S. of her only natural family relationships, without any evidence of adoption prospects, may not be in her best interest.

*Id.* Consequently, terminating the mother's parental rights would remove a stabilizing relationship from the child's life without the benefit of allowing the child to be adopted. *Id.* at *8. Despite our holding that the mother's parental rights should not be terminated, we made it clear that "in no way" did we advocate a return of C.M.S. to the custody of her mother "unless she makes a vast improvement in correcting the conditions reflected in this record." *Id.*

Here, Kendra has a relationship with her mother and wants to keep her mother in her life. Although Mother's current housing arrangement and employment situation are insufficient to allow her to care for Kendra, Kendra is currently in the custody of a foster family, and denying a petition to terminate Mother's parental rights will not change that. *See id.* at *7; *In re Valentine*, 79 S.W.3d at 550. Further, it is most improbable that terminating Mother's parental rights will allow Kendra to be adopted. Kendra's three

younger siblings are all in the same pre-adoptive home, but Kendra cannot be part of their new family. Thus, termination of Mother's parental rights will accomplish nothing other than setting Kendra adrift with no adoptive family.

In *White v. Moody*, we reasoned, "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *See White*, 171 S.W.3d at 194. The unique facts of this case demonstrate that severing Kendra's relationship with Mother without any evidence of adoption prospects is not in her best interest. Based upon these facts, we conclude that the Department failed to clearly and convincingly establish that termination of Mother's parental rights is in Kendra's best interest.

## IN CONCLUSION

Because the Department failed to establish by clear and convincing evidence that termination of Mother's parental rights is in Kendra's best interest, the judgment terminating Mother's parental rights to Kendra is reversed. However, our decision does not return Kendra to the custody of Mother. Instead, Kendra remains in the custody of the Department. Therefore, this matter is remanded to the Juvenile Court for Sevier County for further proceedings consistent with this opinion. Costs of appeal are assessed against the Department of Children's Services.

_____
FRANK G. CLEMENT, JR., JUDGE